**HAGENS BERMAN SOBOL SHAPIRO LLP**
Robert B. Carey #011186
Leonard W. Aragon #020977
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-Mail: rcarey@hbsslaw.com
           leonard@hbsslaw.com

**GRANT WOODS, P.C.**
J. Grant Woods
1726 North Seventh Street
Phoenix, Arizona 85006
Telephone: (602) 258-2599
Facsimile: (602) 258-5070
E-mail: gw@grantwoodspc.net

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| JOHN HALL and BRENDA HALL, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>THE VARIABLE ANNUITY LIFE INSURANCE COMPANY; THE VARIABLE ANNUITY MARKETING COMPANY; THE VARIABLE ANNUITY LIFE INSURANCE COMPANY SEPARATE ACCOUNT A; VALIC FINANCIAL ADVISORS, INC., JOHN A. GRAF; ROBERT A. DEVLIN; KENT E. BARRETT; BRUCE R. ABRAMS; MARY L. CAVANAUGH; M. KATHLEEN ADAMSON; CARL J. SANTILLO; ROBERT P. CONDON; and REBECCA G. CAMPBELL, and DOES 1-100 inclusive,<br><br>                    Defendants. | No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**PAGE**

I.      NATURE OF THE ACTION ..................................................................... 4

II.     JURISDICTION AND VENUE .................................................................. 9

III.    PARTIES .............................................................................................. 10

        A.      Plaintiffs ................................................................................... 10

        B.      Defendants ................................................................................ 11

                1.      The Variable Annuity Life Insurance Company .............................. 11

                2.      The Variable Annuity Marketing Company .................................... 11

                3.      VALIC Financial Advisors, Inc .................................................. 11

                4.      VALIC Separate Account A ....................................................... 12

                5.      Individual Defendants ............................................................. 12

IV.     CLASS ACTION ALLEGATIONS ............................................................ 13

V.      DEFENDANTS' WRONGFUL COURSE OF CONDUCT ................................. 16

        A.      VALIC Targets Qualified Plan Investors for Deferred Annuity Sales ....... 16

        B.      Financial Structure of VALIC's Deferred Annuity Products .................... 17

        C.      Regulation of Deferred Annuities .................................................. 20

        D.      Defendants' Control of the Sales Process .................................... 21

        E.      Defendants' Principal/Agent Relationship with
                Their Sales Representatives ........................................................ 23

VI.     DEFENDANTS' MISREPRESENTATIONS AND FAILURES TO DISCLOSE
        IN SELLING DEFERRED ANNUITY CONTRACTS ....................................... 24

        A.      Material Misrepresentations and Omissions ............................... 24

                1.      Concerning the Purported Tax-Deferral Benefit............................. 24

        B.      Course of Conduct to Sell Deferred Annuities to Persons with No Insurance
                Needs ..................................................................................... 26

VII.    DEFENDANTS' CONCEALMENT OF THEIR QUALIFIED ANNUITY SALES
        SCHEME ............................................................................................. 28

VIII.   DEFENDANTS RECEIVE HIGHER FEES FROM SELLING DEFERRED
        ANNUITIES .......................................................................................... 30

IX.    SOLICITATION AND SALE OF PLAINTIFFS' DEFERRED ANNUITY CONTRACTS ................................................................................................. 32

     A.    John Hall ...................................................................................... 32

     B.    Brenda Hall .................................................................................. 33

X.    DEFENDANTS' FIDUCIARY DUTIES TO AND SPECIAL RELATIONSHIP WITH PLAINTIFFS AND THE CLASS MEMBERS........................................... 34

XI.    DEFENDANTS' CONCERTED ACTIVITY AS JOINT CONSPIRATORS ...... 37

COUNT ONE  (ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER BASED ON THE SALE OF UNITS OF INTEREST IN A SEPARATE ACCOUNT FUNDING VARIABLE ANNUITIES MISREPRESENTATIONS AND OMISSIONS) ...................... 37

COUNT TWO  (ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED AGAINST ALL CORPORATE DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER BASED ON THE SALE OF UNITS OF INTEREST IN A SEPARATE ACCOUNT FUNDING VARIABLE ANNUITIES – COURSE OF CONDUCT TO MAKE SALES RECOMMENDATIONS WITHOUT ANY BASIS) ........................................ 39

COUNT THREE  (ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT) .............. 41

JURY DEMAND.......................................................................................................... 43

Plaintiffs, by their attorneys, make the following allegations for their Class Action Complaint and Jury Demand.  The allegations with respect to Plaintiffs' own acts are based upon knowledge.  Other allegations are based upon facts obtained through the investigations undertaken by Plaintiffs' attorneys.  Plaintiffs believe that further substantial evidentiary support will exist for their allegations after a reasonable opportunity for discovery, especially in view of the fact that much of the evidence supporting the allegations contained herein is within the exclusive control of Defendants.

## I.   NATURE OF THE ACTION

1.   Plaintiffs bring this action as a class action under the Securities Act of 1933 (the "Securities Act"), and the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of themselves and a class (the "Class") consisting of:

> All persons who purchased an individual deferred annuity contract or who received a certificate to a group deferred annuity contract, issued by VALIC, on or after January 1, 1974, to the present (the "Class Period"), that was used to fund a contributory (not defined benefit) retirement plan or arrangement qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401, 403, 408, 408A, or 457.

The covered retirement plans include IRAs, 401(k) plans, 403(b) plans for teacher, hospital, and non-profit organization employees, state government employee plans, and others.

2.   The named plaintiffs have entered into combination fixed and variable deferred annuity contracts with defendant The Variable Annuity Life Insurance Company ("VALIC") and sold to Plaintiffs through VALIC's agents as retirement investments. The deferred annuities sold to Plaintiffs by Defendants are securities under the federal securities laws.

3.   Under the Internal Revenue Code, insurance products, including annuities, are exempt from income taxation on their inside investment build-up (earnings).  The main economic value of a deferred annuity (as opposed to a payout annuity) is to act as a wealth accumulation device that confers tax advantages, including tax deferral of

earnings and the ability to switch among different investment accounts inside the annuity without triggering current taxation.  The tax advantages of investing through a deferred annuity insurance product are, however, unnecessary for persons funding retirement plans that are already tax deferred regardless of the investment used in the plan (*e.g.*, 403(b) plans, 401(k) plans, and IRA rollovers).

4.      As set forth in detail below, Defendants nevertheless target sales of deferred annuities to persons seeking to fund tax-qualified retirement plans.  Plaintiffs and the other members of the Class have suffered, and continue to suffer economic injuries as a result of paying fees and other detriments, including surrender penalties, associated with the insurance aspects of these hybrid insurance and investment products that Plaintiffs and the Class members would not have agreed to pay if Defendants had made full and fair disclosure in the sale that the tax-deferral feature of the annuity is unnecessary because the tax-deferral benefit is already provided by the retirement plan.

5.      Defendant VALIC is a subsidiary of AIG American General, a/ka/ American General Life Companies, f/k/a American General Life Insurance Company and American General Corporation, which is wholly-owned by American International Group, Inc. ("AIG").  Defendant's former subsidiary, Variable Annuity Marketing Company ("VAMCO"), is now, upon information and belief, wholly-owned by VALIC.  Defendant VALIC Financial Advisor, Inc., is a wholly-owned subsidiary of VALIC offering securities and investment advisory services.

6.      VALIC is a life insurance company that uses over 1,500 appointed sales agents ("VALIC Agents") – who hold themselves out to the public as "retirement planning specialists" – to promote sales of deferred annuities.  VAMCO is a broker-dealer member of the Financial Industry Regulatory Authority F/K/A NASD Regulation, Inc. ("NASDR") and performs, on an agency basis, marketing support services on behalf of VALIC in the sale of deferred annuities.

7.      VAMCO, VALIC'S former subsidiary, was a broker/dealer member of NASDR and performed, on an agency basis, marketing support services on behalf of

VALIC in the sale of the annuity contracts at issue in this litigation.  Services previously performed by VAMCO are now, upon information and belief, performed by VALIC.

8.     VALIC and VAMCO train their agents to hold themselves out to the public as financial advisors who have access to a broad range of financial products to meet the needs of clients.  VALIC and VAMCO target 403(b) plan investors (mostly school, hospital and nonprofit organization employees) in particular for deferred annuity sales, and train their agents to recommend a deferred annuity to every prospective customer who is eligible to invest through a 403(b) plan investment, *without disclosing that the deferred annuity product is redundant and unnecessary, and regardless of whether the customer has an insurance need that is met by the product*.  On the other hand, if a VALIC agent honors the best interests of his client and recommends mutual funds instead of deferred annuities for a 403(b) plan investment, then Defendants typically refuse to pay any commissions at all to the agent.

9.     Defendants' conduct is contrary to minimum reasonable industry standards for financial service providers.  For example, in May 1999, NASD Regulation, Inc. issued guidelines to assist members in fulfilling their duties of fair dealing when selling variable deferred annuities.  Specifically, NASDR reminded its members, including defendant VAMCO, that if a sales agent recommends a deferred annuity as an appropriate product for funding a qualified plan, then the sales agent has an affirmative duty to disclose to the prospective customer that "the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary."  *See* NASD NOTICE TO MEMBERS 99-35, *The NASD Reminds Members of Their Responsibilities Regarding the Sales o/Variable Annuities* (May 1999) ("NASD NTM 99-35").

10.     The sales practices obligations identified by NASD NTM 99-35 are not followed by Defendants.  To the contrary, Defendants have expressly repudiated any intention of complying with NASD NTM 99-35 and with their obligations of fair dealing in the sale of deferred annuities.  Defendants' sales training materials explicitly tell

agents to *recommend* deferred annuities as categorically appropriate for *all* qualified plan investors.  In August 2000, VALIC senior compliance personnel from the home office in Texas told a convention of hundreds of VALIC Agents gathered in Las Vegas that the agents did not need to worry about scrutiny relating to the company's non-compliance with NASD NTM 99-35 or relating to private lawsuits by deceived investors, because "VALIC is a big company that can withstand challenges to its sales practices."

11.     VALIC also conducted regional advanced sales training sessions, conducted by VALIC home office personnel, on a quarterly basis.  At the session held in San Mateo, California in May 2001 for VALIC Agents in the western United States, Howard Weinthal, who was VALIC's National Sales Training Coordinator, and Mark Liebert, who was Director of New Representative Training, told the attendees that "you can basically ignore 99-35" and that they did not have to disclose that the tax-deferred earnings feature is provided by the tax-qualified retirement plan itself and that the tax-deferred feature of the variable annuity is unnecessary.  In fact, Messrs. Liebert and Weinthal told the VALIC agents that they should not even "bring it up" with their customers.  Home office trainers also explicitly instructed the VALIC agents that they should not attempt to find out if their customers have a need for insurance that is provided by the variable annuity product before recommending its purchase.  Written training materials distributed nationally also instruct the VALIC agents not to inquire about insurance needs when recommending VALIC deferred annuities.

12.     Based on years of experience, Defendants and VALIC agents knew that if they did discuss the tax issues of selling deferred annuities into qualified plans with the customers, they would never be able to sell the annuities to qualified plan investors.  The tax redundancy issue was known to Defendants and VALIC agents to be material to informed purchase decisions by those customers.

13.     Financial experts who are not biased by an affiliation with a deferred annuity seller have consistently concluded that deferred annuities are not appropriate for qualified plans.  Scrupulous sellers of deferred annuities (*i.e.*, many of the nation's largest

annuity sellers, including Fidelity, Vanguard, Charles Schwab and others) consciously refrain from marketing or selling deferred annuities for use in qualified plans and prominently disclose in sales materials that the product is not appropriate for persons who have not already fully funded their qualified plans.

14.     Defendants' misconduct in selling redundant products to retirement investors is precisely the abuse that prospective customers are told they can trust will not occur if they do business with Defendants.  According to Defendants' web site, "[a]cross America, our local financial advisors meet with our clients.  They can help you identify your goals and needs; evaluate alternatives, and work with you to provide a plan that can meet those goals."

15.     In training provided by Defendants, VALIC agents are instructed that "clients rely on VALIC agents for impartial financial help.  VALIC agents are to be viewed as more than salespeople."  VALIC agents call themselves "financial advisors," rather than insurance agents, when dealing with potential customers.  Consumer surveys show that a consumer will trust a person holding herself out as a "financial advisor" who will recommend an investment and financial plan that will suit the consumer's needs, as opposed to someone who identifies herself as a life insurance salesperson.

16.     Defendants target their sales efforts to market segments containing persons who are typically not sophisticated about retirement investments.  For example, Defendants' sales materials include explanations of basic terms and seek to introduce investors to basic concepts like tax deferral, explaining why it would be of value to have tax deferral as part of a retirement savings plan.

17.     Over time, consumers who are sold deferred annuities to fund their qualified plans suffer severe economic harm.  By retirement age, insurance fees and other detriments of deferred annuities (described more fully below) cause the loss of up to one-third of a retirement investor's account value as compared to straight investment products such as mutual funds.  Moreover, once consumers purchase a deferred annuity, they are trapped:  high surrender fees inhibit them from exiting the arrangement.

18.     Conversely, Defendants' deferred annuity insurance fees provide generous rewards for the seller.  Defendants stand to make substantially more money, and VALIC agents are paid commissions two to ten times higher, for the sale of a deferred annuity compared to sale of "straight" mutual funds.  The insurance fees, spread income, and surrender fees generated from the product (which are in addition to investment management fees and contract administration fees) provide additional profits to Defendants and the additional commissions to VALIC agents.

19.     Defendants' plan, scheme and common course of conduct was designed to and did induce customers to purchase deferred annuity contracts from Defendants.  In fact, Plaintiffs and the members of the Class have lost hundreds of millions of dollars due to Defendants' deceptive and abusive practices.  Defendants' practices are particularly outrageous because Defendants and VALIC agents are in the financial services business, where statutory and decisional laws create duties of fair dealing, full and fair disclosure, and care to Plaintiffs and Class members.

20.     Plaintiffs are among those who have been deceived and abused by Defendants' misconduct.  Therefore, Plaintiffs seek rescission and restitution of the insurance charges paid by Plaintiffs and Class members to VALIC, or reformation and damages of Plaintiffs' and Class members' investment contracts to place them in the investment positions they would enjoy if they had not been deceived into purchasing unnecessary deferred annuities.

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), 28 U.S.C. § 1331, and under the Class Action Fairness Act of 2005, which, inter alia, amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class is a citizen of a State different from any other Defendant," and the aggregated amount in controversy exceeds five million dollars ($5,000,000).  *See* 28 U.S.C. § 1332(d)(2), (6).

22.     This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of the Court that Defendants conduct substantial business within the District and are licensed insurers under the Arizona Insurance code.  Further, Defendants' conduct giving rise to the complaint occurred, in part, in this district and Defendants maintain offices in this district.

23.     Venue is proper in this district under 28 U.S.C. § 1391 because some of the actions alleged in this complaint occurred, in substantial part, in this district.  Specifically, preparation and/or dissemination of materially false and misleading statements and omissions and deceptive sales tactics occurred in this district.  In addition, one or more Defendants either reside or maintain offices in this district; some of the transactions complained of herein occurred in this district; and statements of material fact that were deceptive and misleading or that omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, were made in this district; and the annuities that are at issue in this case are advertised, marketed, and sold in this district.  Additionally, the cases *Drnek, et al. v. The Variable Annuity Life Ins. Co., et al.,* Case No. CV01-242-TUC-WDB and *Bobbitt et al. v. Milberg LLP, et al.*, Case No. CV09-00629-FRZ, alleging substantively the same underlying claims, were filed in this district.

24.     Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone and data communications in connection with the acts and conduct alleged herein.

### III.     PARTIES

**A.     Plaintiffs**

25.     Plaintiff John Hall is an individual residing in Atwater, Merced County, California.  On September 28, 2000, Mr. Hall made an investment in a Variable Annuity Life Insurance Company ("VALIC") annuity contract for inclusion in his 403(b) tax-deferred retirement plan.  He is a member of the proposed class.

26.     Plaintiff Brenda Hall is an individual residing in Atwater, Merced County, California.  On September 28, 2000, Mrs. Hall made an investment in a Variable Annuity Life Insurance Company ("VALIC") annuity contract for inclusion in her 403(b) tax-deferred retirement plan.  She is a member of the proposed class.

**B.      Defendants**

**1.      The Variable Annuity Life Insurance Company**

27.     VALIC is a life insurance company domiciled in the State of Texas, with its home office in Houston, Texas and regional offices throughout the United States. VALIC is a wholly-owned subsidiary of AIG American General, a/ka/ American General Life Companies, f/k/a American General Life Insurance Company and American General Corporation, which are all wholly-owned by American International Group, Inc. ("AIG"). VALIC is licensed to sell annuities in all 50 states and the District of Columbia. According to its website, VALIC sells annuities through 1,532 "financial advisors" and is the investment provider for over two million retirement investors.

28.     On August 29, 2001, American General Corporation (VALIC's former parent corporation) was acquired by AIG.

**2.      The Variable Annuity Marketing Company**

29.     VAMCO is incorporated under the laws of the State of Texas and maintains its corporate headquarters in Houston, Texas.  VAMCO was at all material times a wholly-owned subsidiary of VALIC.  VAMCO is a broker/dealer member of NASD Regulation, Inc. and performs, on an agency basis, marketing support services on behalf of VALIC in the sale of the annuity contracts at issue in this litigation.

**3.      VALIC Financial Advisors, Inc**

30.     Defendant VALIC Financial Advisors, Inc., is incorporated under the law of the state of Texas and maintains its corporate headquarters in Houston, Texas.  VALIC Financial Advisors is the securities and investment advisory services arm of VALIC, and is a member of FINRA, SIPC (Securities Investor Protection Corporation) and a SEC-registered investment advisor.

11

**4.       VALIC Separate Account A**

31.     Defendant The Variable Annuity Life Insurance Company Separate Account A ("VALIC Separate Account A") was established by VALIC on or about July 25, 1979, under Texas law.  VALIC Separate Account A is registered with the SEC as a unit investment trust under the Investment Company Act of 1940.  Units of interest in VALIC Separate Account A are registered as securities under the Securities Act.

**5.       Individual Defendants**

32.     Defendant John A. Graf ("Graf") is the former Chairman, Chief Executive Officer and President of VALIC, and was held those positions when the events giving rise to this complaint took place.  Defendant Graf was also Senior Vice Chairman, Asset Accumulation, for the American General Financial Group.

33.     Defendant Robert A. Devlin ("Devlin") is a Director of VALIC.  Defendant Devlin is also Chairman, President and Chief Executive Officer of the American General Financial Group.

34.     Defendant Kent E. Barrett ("Barrett") is a Director and Executive Vice President, Chief Financial Officer and Principal Accounting Officer of VALIC.

35.     Defendant Bruce R. Abrams ("Abrams") is a Director and Executive Vice President of Sales of VALIC.

36.     Mary L. Cavanaugh ("Cavanaugh") is a Director of VALIC.

37.     M. Kathleen Adamson ("Adamson") is a Director of VALIC.

38.     Defendant Carl J. Santillo ("Santillo") is a Director and Executive Vice President of Operations of VALIC.

39.     Defendant Robert P. Condon ("Condon") is a Director and Executive Vice President of Institutional Marketing of VALIC.

40.     Defendant Rebecca G. Campbell ("Campbell") is a Director and Senior Vice President of Human Resources of VALIC.

41.     Defendants Graf, Devlin, Barrett, Abrams, Cavanaugh, Adamson, Santillo, Condon and Campbell (collectively, the "Individual Defendants") signed registration

1  statements filed with the SEC pursuant to the Securities Act for units of interest in

2  VALIC Separate Account A.

3  42.  Defendants Graf, Devlin, Barrett, Abrams, and Condon (collectively, the

4  "Individual Control Person Defendants") were during the Class Period controlling

5  persons of VALIC within the meaning of Section 15 of the Securities Act and

6  Section 20(a) of the Exchange Act.

7  **6.  Does 1-100**

8  43.  Plaintiffs are informed and believe that at all relevant times there existed or

9  exists, as to Doe Defendants 1 through 100, inclusive, a unity of interest and ownership

10  with Defendants and the other Doe Defendants such that any individuality and

11  separateness has ceased to exist.  Defendant and the Doe Defendants are the successor

12  corporations and alter-egos of each other in that the individual defendants have used

13  assets of each other for their personal uses, have caused assets of those entities to be

14  transferred without adequate consideration and have withdrawn funds from each others'

15  bank accounts for their personal use.  Defendants and Doe Defendants 1 through 100

16  have controlled, dominated, managed, operated and intermingled their personal assets

17  with each other to suit their convenience and whim.  Fraud and injustice would be

18  promoted by adhering to the fictions of Defendant and the Doe Defendants remaining

19  separate and apart from each other, and they should not be allowed to evade justice by

20  asserting the corporate or other limited liability veil. Doe Defendants include, but are not

21  necessarily limited to, any and all successor corporations of VAMCO and VALIC

22  Separate Account A not already included as a Defendant.

23  **IV.  CLASS ACTION ALLEGATIONS**

24  44.  Plaintiffs bring this action as a class action pursuant to Rule 23 of the

25  Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of:

26            All persons who purchased an individual deferred annuity

27            contract or who received a certificate to a group deferred
annuity contract, issued by VALIC, on or after January 1,
1974, to the present (the "Class Period"), that was used to

28            fund a contributory (not defined benefit) retirement plan or

13

arrangement qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401, 403, 408, 408A, or 457.

Excluded from the Class are Defendants, the other officers and directors of the corporate defendants, and the members of those persons' immediate families, any entity in which any defendant has a controlling interest, and the legal affiliates, heirs, controlling persons, agents, successors and predecessors in interest or assigns of any such excluded person or entity.

45.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, persons who purchased Defendants' deferred annuity contracts for use in qualified retirement plans are believed to number in the thousands, and are widely dispersed geographically.  Class members may be identified from the records maintained by Defendants and/or their agents, and Class members may be notified of the pendency of this action using a form of notice and dissemination methods similar to those customarily used in other class actions.

b.     Plaintiffs' claims are typical of the claims of the other members of the Class.  Plaintiffs and all members of the Class purchased and/or acquired their deferred annuities in reliance upon Defendants' statements to the public and sustained damages as a result of Defendants' wrongful conduct complained of herein.

c.     Plaintiffs are representative parties who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action securities litigation.

d.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable.  Furthermore, because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to individually redress the wrongs done to them.

14

e.    Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

f.    There are common questions of law and fact that predominate over any questions affecting any individual members of the Class.

46.    The questions of law and fact that are common to Plaintiffs and the Class include, among others:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether Defendants and their agents sold securities during the Class Period by means of standardized, untrue and/or misleading statements of material fact or by means of standardized omissions of material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading;

c.    whether Defendants and their agents acted in concert or engaged as principal and agent in the making of materially false and misleading statements in connection with the sale of deferred annuities, and/or in a common course of conduct in recommending deferred annuities to persons with no insurance needs who were invested through qualified plans;

d.    whether, with respect to claims alleged under the Exchange Act, Defendants and/or their agents acted with knowledge or with reckless disregard for the truth in omitting to state and/or misrepresenting material facts;

e.    whether VALIC and VAMCO were controlling persons of VALIC agents under Section 20(a) of the Exchange Act;

f.    whether the Individual Control Persons Defendants were controlling persons of VALIC within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act;

g.    whether VALIC was a controlling person of VAMCO within the meaning of Section 20(a) of the Exchange Act;

h.    whether punitive damages should be awarded;

15

i.      whether Plaintiffs and Class members are entitled to the injunctive and declaratory relief requested herein; and

j.      whether Plaintiffs and the Class have been damaged or are entitled to restitution or reformation as a result of the misrepresentations and omissions and course of conduct described herein, and, if so, the appropriate measure of damages in this action.

## V.      DEFENDANTS' WRONGFUL COURSE OF CONDUCT

**A.      VALIC Targets Qualified Plan Investors for Deferred Annuity Sales**

47.      Marketplace competition has dramatically reduced the sales compensation (commissions) paid to intermediaries for sales of mutual funds and many other financial products.  By contrast, the commissions paid for sales of deferred annuities are now among the highest available in the market, typically two to ten times higher than the prevailing commission rate for mutual funds.  Moreover, deferred annuities are one of the last remaining tax shelters available to the public.  As a result of these factors, deferred annuities have grown in recent years from relative obscurity to the largest business segment of the United States life insurance industry.  Sales of variable deferred annuities soared to a reported $137.5 billion in calendar year 2000, compared to $4.6 billion in 1987.

48.      Meanwhile, the retirement investment market in the United States has undergone a revolution over the last two decades.  Instead of guaranteed lifetime pension benefits calculated based on retirees' life expectancies, modern contributory retirement plans – including IRAs, 401(k)s and 403(b)s – now predominate.  Contributory plans require participants to manage their own retirement investments.  These retirement plans focus on maximizing asset accumulation for retirement.  Investment growth on a tax-deferred basis, accordingly, has become a key consideration.  Retirement plans are the largest assets owned by many households (larger than home equity), yet most individuals are not well-equipped to deal with the complex considerations involved in effectively managing these assets.

49.     The sales transactions at issue in this complaint (particularly those involving funds reinvested into rollover IRAs) are in many instances the single most financially consequential decision many persons will make in their lifetimes.  Given the simultaneous growth in recent years of tax-deferred investments (*e.g*., deferred annuities) and tax-deferred contributory retirement savings plans, many people are easily confused by sales materials and presentations presenting tax deferral as a reason to buy deferred annuities.  Defendants have willfully capitalized on this point of confusion to induce and profit from sales of deferred annuities to persons who do not benefit from them.  Each year VALIC receives hundreds of millions of dollars in premiums from annuity contracts sold to the qualified plan market, despite the fact that the dollars invested pursuant to those contracts already enjoy tax-deferred status.

50.     Persons who agree to use a deferred annuity to fund their qualified plan invariably are persons who do not realize that deferred annuities provide no tax-deferral benefit in this situation.  An article in SMARTMONEY magazine states that "perhaps the most common pitfall in retirement investing [is] a tax-deferred product inside a tax-deferred account."  Jersey Gilbert, James R. Hagy and Christopher Oster, *Investing for Retirement,* SMARTMONEY, at 111 (Dec. 1998).  Scrupulous marketers of deferred annuities devote prominent portions of their advertising and sales materials to inform consumers that a deferred annuity should not be considered until after consumers have fully funded their qualified plans.  By contrast, VALIC deliberately targets qualified plan investors for deferred annuity sales.

**B.     Financial Structure of VALIC's Deferred Annuity Products**

51.     Deferred annuities are a different product from traditional annuities.  In its traditional sense, an annuity is the reverse of life insurance.  Life insurance pools the risk of a premature death, while a traditional annuity pools the risk of living too long.  When a consumer purchases a traditional annuity, the consumer typically acquires, in exchange for an up-front premium payment, the right to a stream of periodic payments from the insurer that is guaranteed to continue for as long as the annuitant is alive.  This type of

17

annuity can provide comfort and protection for persons who are afraid that they may outlive their assets.  To find the best deal, consumers can shop for an annuity that provides the highest benefits in comparison with the premium paid in, also taking into consideration the fact that the financial strength of the issuing life insurance company is the sole basis of its payment guarantee.  This traditional annuity is a product sold by the insurance industry known as an "immediate annuity" (or "payout annuity") because annuity payments to the contract owner (or purchaser) begin immediately after she tenders the premium to the insurer.

52.     In contrast to an immediate annuity, a deferred annuity – the type of annuity at issue in this complaint – is an accumulation product.  As a leading authority comments:

> It is important to keep in mind that there are two different products called "annuities" offered by the insurance industry, and they have very little in common.  The first such product, the deferred annuity, is basically an investment vehicle. Deferred annuities. . . have settlement options which provide a periodic income, but the settlement options are most often not elected and almost never play an important part in the purchase or selection of a particular deferred annuity.

Albert E. Easton and Timothy F. Harris, *Actuarial Aspects of Individual Life Insurance and Annuity Contracts* (ACTEX Publications 1999) at 20.  With a deferred annuity, the purchaser invests money and intends the value of the account to grow (depending on the performance of the investment vehicle that is chosen).

a.     *Fixed and variable deferred annuities*.  Within a deferred annuity, there may be a wide range of investment options.  In *fixed accounts* funding a deferred annuity, the purchaser receives from the insurer an interest rate on the amount of premiums paid into the product by the purchaser; the insurer may contractually agree to a particular rate for a period of time, but more typically the insurer adjusts the rate at its discretion.  In *variable accounts* funding a deferred annuity, the purchaser receives "units" representing interests in one or more "subaccounts" of a separate account sponsored by the insurer, containing equity, bond or money market portfolios, which are

18

usually managed by outside investment managers (and can be managed and named so as to mimic well-known "brand name" mutual funds offered by those managers, even though they are different investments and will have a different performance record).  A deferred annuity with both fixed and variable accounts is a combination deferred annuity.

b.    *Deferred annuities are tax shelters*.  A deferred annuity is an instrument, like a qualified retirement plan, to obtain special tax benefits for investments. Tax deferral on earnings in a deferred annuity is provided by the Internal Revenue Code. 26 U.S.C. § 72.

c.    *Annuitization of a deferred annuity is the purchase of a payout annuity*.  At a date selected by the owner, withdrawals can be made from a deferred annuity.  The owner may take an immediate lump sum or a periodic withdrawal plan of some or all of his investment.  Or, as another payout option, he may "annuitize," which is essentially the purchase of a payout annuity.  Under current tax law, the tax-deferral advantage of the product is present regardless of whether the account balance is ever actually converted into a payout annuity.

d.    *A payout annuity option is available to anyone*.  A payout annuity can be purchased with the some or all of the money in any retirement account, regardless of the investment funding the plan.  It is not necessary to buy a deferred annuity in order to be able to obtain a payout annuity income stream.

53.    Deferred annuities typically contain two insurance features: specified minimum annuity purchase rates for the annuity payout options, and a "death benefit" that contractually provides that if the account owner dies during the investment period, his or her heirs receive some defined amount (*e.g*., the principal amount invested) even if the investment has crashed at that time.  However, the life insurance industry's own experts have conceded that the value of these insurance features of a deferred annuity is so nominal that informed consumers would not choose to buy the product in the absence of a tax-deferral benefit.  Michael Lane, president of AEGON Financial Services Group, reportedly reminded his colleagues of the reality that the "death benefit feature is a

19

waste" for buyers because, of the contract holders who die, the number "actually benefiting from the death benefit [is] statistically irrelevant." *National Underwriter-Life/Health* at 15 (Feb. 22, 1999).

54.     Because of their tax-deferred status, deferred annuities are potentially attractive financial products to people who have long-term investment objectives (although studies show that it takes several decades before the benefits of tax deferral begin to outweigh the drag of the annuity's higher fees). Thus, deferred annuities are marketed by scrupulous companies as being potentially appropriate retirement investments only for individuals who have already made their maximum contributions to IRAs, 401(k)s or other qualified plans available to them, and are looking for an additional tax-deferred retirement investment vehicle.

55.     Qualified plans, as that term is used in this complaint, refers to contributory plans and accounts that themselves already enjoy tax-deferred status (and are thus "qualified") under the Internal Revenue Code, regardless of the investment funding the plan. These include many of the most popular and common plans for retirement investing: IRAs, Keogh and 401(k) plans, 403(b) plans and other accounts treated similarly by the tax code.

**C.     Regulation of Deferred Annuities**

56.     The deferred annuities sold by Defendants contain various components with different characteristics. One result is that these products are subject to dual state and federal regulation. The separate account, which contains subaccounts, each holding a portfolio of equities or bonds or other investments, is regulated at the federal level as an investment company, and (if no exemption applies) the units of interest in the separate account are registered as securities and sold pursuant to federal securities law requirements. In addition to sponsoring a separate account, VALIC also provides one or more "fixed account" options as part of its combination fixed and variable deferred annuities. The fixed accounts, which credit an interest rate to purchasers, are funded by VALIC's general account. Provided certain prerequisites are met, the solicitation and

sale of investments in the fixed account to purchasers is not subject to federal securities law jurisdiction or requirements.  The sale of deferred annuities at issue in this case also involves the issuance of an individual insurance contract, or issuance of an individual certificate to a group annuity, directly between VALIC and each of the Plaintiffs and Class members.  The fixed accounts and the insurance contract components of the combination annuities are regulated by each of the respective 50 states as insurance, and the marketing, sale and issuance of these components are subject to state insurance law requirements and are otherwise governed by state law, and are not subject to the federal securities laws.

57.     Consistent with dual regulation, state insurance laws require that persons who sell annuities must be licensed insurance agents.  *See*, *e.g*., A.R.S. §§ 20-282, 20-287.  In addition, annuities that contain units of interest in separate accounts that are registered with the SEC as securities may only be sold by persons who are appointed insurance agents as well as registered with NASDR and associated with a NASDR member broker/dealer.  *See* 15 U.S.C. § 78o.

**D.     Defendants' Control of the Sales Process**

58.     In addition to their own direct corporate misconduct in the marketing of deferred annuities, Defendants also train, through the use of uniform training materials, and supervise the sales practices of, the VALIC Agents, who are appointed with state insurance departments to act on the insurer's behalf in the solicitation, recommendation and sale of deferred annuities to members of the public.  Defendants exercise substantial control over the entire sales process.  In contrast to the issuers of other types of investments, such as initial public offerings of stocks and bonds, Defendants' relationship with their sales agents is one in which the agents are the functionaries of the Defendants in inducing sales of deferred annuity contracts.

59.     State insurance law requirements also impose a non-delegable duty on life insurers, such as VALIC, to supervise sales of their deferred annuities (regardless of whether their sales agents are exclusively appointed by VALIC).  Pursuant to regulatory

21

requirements, VALIC prepares or pre-approves each piece of advertising and sales material used to effect sales of its deferred annuities.  Agents are forbidden to use any sales material in the promotion of VALIC products that has not been approved by VALIC.  Each deferred annuity application is forwarded to VALIC, which easily ascertains from information on the application whether the deferred annuity will be used to fund a qualified plan.  VALIC has sole authority to determine whether to issue the contract for that particular purpose.

60.     Pursuant to a written selling agreement with VALIC, VAMCO provides, on an agency basis, marketing support in the sale of VALIC deferred annuities.  Each of the insurance agents appointed with state insurance departments to act on behalf of VALIC is also a registered representative (for the sale of securities) associated with VAMCO, which is an NASDR member broker/dealer, in order to sell variable annuities in compliance with federal securities law requirements.

61.     Defendants train and encourage their agents to target people who are looking to fund qualified plans for deferred annuity transactions.  Defendants and their agents seek out persons eligible to make 403(b) plan contributions, or who wish to fund IRA accounts, or are persons who have large lump sums in corporate retirement plans that need to be rolled over to IRAs to preserve the tax-deferred status of the money.

62.     The amounts of money being invested in qualified plans are so large that Defendants apparently cannot resist the enhanced profits they and their agents can make by proposing deferred annuities for investment in qualified plans, even though these redundant products severely compromise the wealth accumulation objective of a qualified plan; even though Defendants and their agents hold themselves out as retirement planning experts and financial advisors rather than insurance salespersons; and even though Defendants and their agents also sell non-redundant non-insurance products.

63.     Defendants encourage their sales agents to sell annuities through deceptive means for qualified plans, rather than to sell mutual funds, by, among other things, (a) establishing rules that no sales commissions are paid for sales of mutual funds to

22

VALIC annuity owners as replacement investments; (b) refusing to allow mutual funds to be sold by VALIC agents to prospects in the company's largest qualified plan markets; (c) establishing agent quotas for deferred annuity sales; and (d) in other qualified plan markets (such as rollover IRAs), deliberately setting up compensation structures to provide an agent with a substantially greater commission and other compensation if the agent sells a deferred annuity, rather than mutual funds, for funding the plan.

**E.      Defendants' Principal/Agent Relationship with Their Sales Representatives**

64.      By holding themselves out as experts in financial planning and retirement savings plans, Defendants encourage customers, including Plaintiffs and the members of the Class, to rely on Defendants' superior knowledge when making their decisions to establish relationships with Defendants and to purchase and invest in Defendants' financial products, including the deferred annuity contracts at issue herein.

65.      But for Defendants' targeting of qualified plan investors using the methods described above, purchasers never would have conceived of using a deferred annuity contract to fund their retirement investment plans.  Defendants are the direct collectors and beneficiaries of the insurance fees, spread income, and surrender penalties that they assess pursuant to the insurance contracts that govern the qualified plan investments at issue in this complaint.  Defendants pay the sales commissions to their agents, which directly motivate the agents to induce these sales.  As a result of Defendants' training programs, their agents develop close, confidential relationships with their customers. Defendants' agents are trained to encourage customers, including Plaintiffs and Class members, to reveal personal confidential information to the agents, and to rely upon the agents for financial advice and counseling based on the agents' knowledge and expertise concerning the sophisticated and complex financial products offered by Defendants. Defendants' customers, including Plaintiffs and the members of the Class, put their trust and confidence in Defendants and their agents in making their decisions to purchase Defendants' financial products, including the deferred annuity contracts at issue herein.

23

66.     In addition to their direct relationships with their customers, Defendants also assume responsibility for the deceptive annuity sales practices described herein as principals for the actions of their sales agents.  When recommending Defendants' deferred annuities to prospective customers, VALIC agents are acting in their capacity as Defendants' appointed agents.

67.     By virtue of the fact that VALIC agents are acting within the scope of their agency relationship with Defendants in selling Defendants' deferred annuities for qualified plans, the deficiencies in the manner in which these sales are affected are the responsibility of and imputed to defendants as principals.  In addition, the deceptive sales practices at issue in this complaint are directly conceived, orchestrated, ratified and affirmed by the Defendants, as described above.

### VI.     DEFENDANTS' MISREPRESENTATIONS AND FAILURES TO DISCLOSE IN SELLING DEFERRED ANNUITY CONTRACTS

**A.     Material Misrepresentations and Omissions**

**1.     Concerning the Purported Tax-Deferral Benefit**

68.     Defendants and VALIC agents sold deferred annuity contracts by making material misrepresentations and/or failing to disclose material facts to Plaintiffs and the members of the Class or their employers.

69.     In each of the transactions at issue in this complaint, a VALIC agent made a recommendation that a deferred annuity product was appropriate for funding a qualified plan.  This recommendation was materially misleading because at no time during the annuity product recommendations made by VALIC agents, was the customer told that the tax-deferral feature of the deferred annuity was redundant and unnecessary.  At no time was there any discussion of the relative advantage of life insurance and annuity death benefits and the associated costs.  The VALIC agents' recommendation of the deferred annuity was based on a course of conduct that gave no consideration to the customers' needs and objectives nor on full and fair disclosure of the redundancy of the product.

70.     Defendants and VALIC agents expressly promote a tax-deferral advantage for purchasers of deferred annuities indiscriminately, even to prospective customers for

whom the advantage" does not exist, *i.e.* customers seeking to fund a qualified plan.  A brochure for Defendants' "Portfolio Director" combination deferred annuities states:

> Tax-Deferred Growth
>
> With Portfolio Director you benefit from the power of tax-deferred growth.   Taxes on all interest and earnings are deferred until you withdraw the money from your Portfolio Director account, usually at retirement.  And the power of tax deferral accelerates your account's growth.  Just compare the accumulation of a Portfolio Director tax-deferred annuity to that of a conventional, non-deferred plan.

71.     This type of uniform sales brochure, which was created and reviewed by Defendants, is misleading and omits material information as to Plaintiffs and the Class members.  Defendants never disclose in the brochure that the purported tax-deferral "benefit" is available to any qualified plan investor, regardless of whether they fund their qualified plan with the "Portfolio Director."

72.     Defendants' prospectuses are also materially false and misleading and omit material information concerning the purported tax-deferral benefit of deferred annuities as to Plaintiffs and Class members.  For example, Defendants' prospectuses for the Portfolio Director Fixed and Variable Annuity include extensive discussion, under the heading of "Federal Tax Matters," that tells investors that the annuity product provides tax-deferred accumulation, and promotes the benefits of tax deferral over time for investors, but fails to explain that the tax deferred benefits and associated insurance costs of a deferred annuity are unnecessary for qualified plan investors.

73.     These materially false and misleading statements and material omissions by Defendants, including statements through their agents, fraudulently induce purchases of deferred annuities because they give the materially false and misleading impression that the product provides the key tax-deferral benefit sought by investors, when, in fact, tax deferral is not a reason for qualified plan investors to purchase the product because any investment funding a qualified plan is tax deferred.

74.     Reasonable consumers are not experts in annuities or the taxation aspects of qualified plan investment choices and are not on guard to suspect that Defendants' communications to them are false, and do not have reason to suspect that the extra layer of insurance fees and other detriments imposed by the product are to secure tax advantages that they already automatically enjoy.  Fully aware that prospective contract owners would find it material that the product's main benefit is redundant and unnecessary to qualified plan investors, Defendants and VALIC agents nevertheless do not disclose these facts in offering or selling deferred annuities.

75.     By contrast, scrupulous marketers prominently disclose in advertising and sales materials that the product is not appropriate for persons who have not already fully funded their tax-deferred qualified plans.  For example, prospective Fidelity customers are informed that a "deferred variable annuity might be right for you if you're [already] contributing the maximum to your 401(k) or other employer-sponsored retirement plan, fully funding your IRA, and are looking for yet another way to build assets that you can use for income in retirement."

76.     Defendants' uniform sales presentations are prepared, approved and disseminated by Defendants and used by VALIC Agents in selling deferred annuities to Plaintiffs and members of the Class or their employers.  In fact, Plaintiffs and the members of the Class or their employers would not have purchased VALIC deferred annuities from Defendants for use in their qualified retirement plans if they had been told the truth about those subjects.

**B.     Course of Conduct to Sell Deferred Annuities to Persons with No Insurance Needs**

77.     Defendants and VALIC Agents affirmatively engaged in a course of conduct to target and recommend to qualified plan investors the sale of deferred annuities when,  pursuant to their duties of fair dealing, defendants and VALIC Agents were required to determine whether there was an insurance need that was met by the product prior to making such a recommendation.

78.     The sales recommendations by Defendants and VALIC Agents were materially misleading.  Defendants and VALIC agents had no basis to believe that clients understood the tax redundancy, and had no basis to conclude that the client had an insurance need met by the product.  VALIC has no procedures in place even to collect information about the insurance needs of prospective deferred annuity clients.  Moreover, while the death benefit insurance feature of a variable annuity product has nominal value, if a benefit is ever paid it is taxed adversely.  An informed client that had a need for life insurance protection for heirs would select a tax-free life insurance benefit available from a life insurance product.  Even guaranteed issue life insurance products are more valuable and economical than a taxable death benefit potentially payable through a variable annuity insurance contract.

79.     Plaintiffs and Class members would not have agreed to accept the recommendation to use a deferred annuity to fund a qualified plan in the absence of Defendants' misconduct.  Defendants and VALIC agents intended for investors to rely on their recommendations.  The Conduct Rules promulgated by NASDR explicitly warn sellers of securities that knowingly making indiscriminate recommendations will subject them to anti-fraud enforcement.  NASDR NTM 99-35 states that it is minimum reasonable industry practice to document an insurance need met by the deferred annuity product prior to recommending it to a qualified plan investor.

80.     In a speech at the National Association for Variable Annuities ("NAVA") Regulatory Affairs Conference on June 28, 1999, Paul Roye, the SEC's Director of the Division of Investment Management at the time, stated:

> Whether a life insurance company has a captive or independent sales force, or distributes its products through intermediaries, controls must be in place to prevent sales practice abuses to the greatest extent possible.
>
> *  *  *
>
> Effective internal controls to prevent, detect, and correct misleading or abusive sales practices are essential.

The SEC staff has also stated that "during inspections they will scrutinize insurers to make sure they are conducting a suitability review."

81.     Many VALIC Agents have recognized their conflict of interest between executing the fraudulent and deceptive sales practices of VALIC and their adopted duties as "financial advisors" to their clients.  One agent who expressed concern to his manager that VALIC was "thumbing their nose at 99-35," was told that he did not "have anything to worry about" because he was "just an agent."  In fact, at least two agents were fired from VALIC after selling a client a mutual fund, rather than a variable annuity.

82.     These conflicts are particularly pronounced when the same VALIC agent is directed by VALIC to alternate between recommending mutual funds and recommending annuities, based on VALIC's assessment of the likely sophistication of the prospect and the market segment being targeted, rather than on the client's actual needs and objectives.  Kathryn M. Hooker, a VALIC agent in Tucson, Arizona, was so conflicted by VALIC's deceptive sales practices that she was forced to resign under protest.  She sent a letter to Gary Petrytus at VALIC on October 12, 2000, stating:

> Mutual fund sales.  Valic is stressing over and over that we should be selling more mutual funds.  Why don't we offer a 403(b)7 [mutual fund product]?  While we were enrolling Scottsdale Healthcare, we continually expressed to clients they no longer need an annuity in a qualified plan.  This goes along with the NASD ruling which states annuities should not be used for a qualified plan.  Yet, when I go back to my groups I am supposed to sell annuities, I am not comfortable talking out of both sides of my mouth depending on which group I am speaking with.  All products should be available to all clients.  American General profit margins should not be a consideration to what I am allowed to offer my clients.

## VII.   DEFENDANTS' CONCEALMENT OF THEIR QUALIFIED ANNUITY SALES SCHEME

83.     Defendants affirmatively concealed their wrongdoing from the general public that purchased the annuities.  This concealment began at the time that Defendants and VALIC agents sold Defendants' deferred annuities for funding purchasers' qualified

plans, continued through the times when additional investments into the product were sold, and continues through the present.

84.     Defendants took affirmative steps to conceal from purchasers that they were paying for a specialized tax-sheltered investment product inside an already tax-sheltered retirement account.  For example, Defendants used contracts and other materials written in technical jargon designed to conceal that purchasers do not actually receive the promoted tax advantages or benefits of the deferred annuity when the product is used for the funding of qualified retirement plans.

85.     Defendants continued to tout the tax-deferral advantages of VALIC's annuities to purchasers with qualified plans even after the sales.  Subsequent materials provided by Defendants after the sale affirmatively concealed and delayed or forestalled investigation by purchasers that would have uncovered the deception perpetrated by defendants.

86.     Defendants' post-sale acts prevented and deterred any meaningful inquiry or investigation by Plaintiffs and the members of the Class that would have disclosed Defendants' deceptive conduct.

87.     The running of the statute of limitations on claims belonging to Plaintiffs and members of the Class related to Defendants' conduct have been tolled due to Defendants fraudulent concealment and delayed discovery alleged herein.  Defendants, through various devices of misrepresentation and secrecy as alleged herein, affirmatively and fraudulently concealed the truth about the nature of their deferred annuity products from Plaintiffs and the members of the Class.  Plaintiffs and the members of the Class had no knowledge of Defendants' schemes and unlawful conduct, or of any of the facts that might have led to the discovery of the wrongdoing, and could not reasonably have obtained such an advanced level of expert knowledge even through diligent effort, before the investigation and filing of this complaint.

88.     In addition, claims belonging to Plaintiffs and members of the class were tolled during the pendency of the case captioned D*rnek, et al. v. The Variable Annuity*

1    *Life Ins. Co., et al.,* Case No. CV01-242-TUC-WDB, to include the pendency of any and

2    all appeals, including the time period to seek certiorari to the Supreme Court of the

3    United States following the United States Court of Appeals for the Ninth Circuit's

4    decision in *Drnek, et al. v. Variable Annuity Life Insurance Company, et al,* 261 Fed.

5    Appx. 50, 2007 U.S. App. LEXIS 29972 (9th Cir., December 21, 2007)

### VIII.  DEFENDANTS RECEIVE HIGHER FEES FROM SELLING DEFERRED ANNUITIES

6

7        89.    As a result of the misconduct of Defendants and VALIC Agents, it was and

8    is foreseeable to Defendants that Plaintiffs and the members of the Class would pay fees

9    and charges and suffer detriments in excess of what they would have paid for straight

10   investment vehicles.  The additional charges and other detriments incurred by purchasers

11   of Defendants' annuities include:

12           a.    With a variable annuity, VALIC obtains fees from investors'

13   accounts through asset-based charges assessed as a percentage of the value of the account

14   (these fees are in addition to the asset-based investment management fees assessed by the

15   managers of the investments).  The largest of these fees collected by VALIC is usually

16   the mortality and expense risk ("M&E risk") fee, which is typically 1.00 to 1.25 percent

17   (100 to 125 basis points).  There are also charges for contract administration.

18           b.    With a fixed annuity (and the fixed-rate general account investment

19   option in a variable annuity), the contract owner's money is invested in the insurer's

20   general account, and the insurer typically adjusts the interest crediting rate at its

21   discretion, even though contract owners are locked into the contract for long periods of

22   time.  Unlike bank CDs and nearly every other financial product on the market, a seller of

23   a fixed annuity (*i.e.* an insurance company) is in the unique position of being able to

24   determine the implicit cost and competitiveness of the product to the purchaser after the

25   purchaser is locked in.  A textbook on annuities, authored by an annuity promoter, states

26   that:

27           every [annuity] has expenses; some of them are more
             identifiable than others.  There are two basic approaches used
28           by insurers in obtaining these fees – explicit and implicit.

1
2
3

> Explicit charges are clearly spelled out. . . .  Implicit charges are made indirectly and can often be much higher than their explicit counterparts. . . .  Implicit charges [are] indirect, hidden costs, such as the difference between returns actually earned versus the amount credited to your account.

4
5

Gordon K. Williamson, GETTING STARTED IN ANNUITIES, at 218 (John Wiley & Sons, Inc. 1999).

6
7
8
9
10

          c.      Deferred annuities also have back-end loads, or surrender fees. These fees are assessed in the event that the contract owner elects to withdraw invested funds prior to the expiration of a contractually specified period.  A typical surrender fee is 5% of the contributions received during the most recent 60 months, or 5% of the amount withdrawn, whichever is less.

11
12
13
14
15
16
17
18
19
20

          90.      Although Defendants' contract prospectuses represent to prospective purchasers that the M&E insurance charge is used solely to pay for the insurance features, in truth the actual cost of the insurance features accounts for the smallest portion of the M&E risk charge.  The M&E risk charge actually is in large part earmarked in advance for distribution expenses, including paying off the sales commission.  Industry leaders acknowledge that insurance fees are used to hide the sales load from consumers who have been educated to watch out for investment sales loads.  "The myth in the annuity business is that M&E charges are high because of annuities' insurance benefits," says eAnnuity.com CEO Shane Chalke.  "That's not true.  M&Es are high because annuities have high commission rates."  MONEY (Jan. 2000) at 91, 93.

21
22
23
24
25
26
27
28

          91.      Agents receive commissions either as a lump sum up-front payment, or some combination of initial payment and annual trail commissions.  If an annuity purchaser decides to terminate his or her investment within the first 7 to 12 years, *i.e.*, before Defendants have had a chance to collect enough annuity fees to cover the sales commission paid to the agent – the additional surrender fee provides Defendants with funds to cover the full amount of commissions.  As a result, annuity purchasers are trapped: by the time they realize that they are paying for a redundant product, the only way they can extract themselves from the arrangement is to pay the large surrender fee.

92.     The compounded effect of these annuity fees over the course of a few decades – not counting any surrender fees – can consume as much as one-third of a retirement investor's account, as compared to straight investments such as mutual funds.

## IX.    SOLICITATION AND SALE OF PLAINTIFFS' DEFERRED ANNUITY CONTRACTS

**A.    John Hall**

93.     In 2000, Mr. Hall met with a VALIC Agent to discuss his retirement plan investment options.  Mr. Hall was aware that the agent was a financial advisor with VALIC, a company known for retirement plan expertise.

94.     The agent was duly appointed by VALIC to act on behalf of VALIC as VALIC's agent in the solicitation, recommendation and sale of deferred annuities, and was, upon information and belief, a licensed agent with the State of California Department of Insurance .  The agent recommended to Mr. Hall that he invest his monies in a VALIC deferred annuity. The annuity was a contributory plan that qualified for favorable income tax treatment pursuant to, upon information and belief, Internal Revenue Code sections 401(a).  As a public school teacher, Mr. Hall was eligible to participate in salary deferrals for the plan.

95.     At no time during the product recommendation or sale was Mr. Hall told that the tax-deferral feature of the deferred annuity was redundant and unnecessary for him.  At no time was there any discussion of the relative advantage of life insurance and annuity death benefits and the associated costs.

96.     The agents' recommendation of the deferred annuity was based neither on Mr. Hall's needs and objectives nor on full and fair disclosure of the redundancy of the product.  The agent, as VALIC's agent, was paid a sales commission substantially larger than any mutual fund commission available.

97.     Mr. Hall was not told and was not aware of these facts, and he reasonably relied on the VALIC Agent's recommendation of the product, which was misleading in the absence of a clear disclosure that the main tax-deferred investing advantage of the product was redundant and unnecessary for him.  As a result of the deception in the sale,

Mr. Hall accepted the recommendation to invest in the VALIC deferred variable annuity. Shortly thereafter, VALIC issued the deferred annuity policy to Mr. Hall.

98.     Mr. Hall made additional investments into the contract until the present, including purchases of additional units of interest in the separate account.

99.     In December 2009, Mr. Hall was shocked to learn for the first time, through discussions with counsel, that the VALIC deferred variable annuity was a redundant and unnecessary product for qualified plan investors such as himself.  Had these facts been meaningfully disclosed during the sales process, Mr. Hall would not have agreed to purchase the deferred annuity.

**B.     Brenda Hall**

100.    In 2000, Brenda Hall met with a VALIC Agent to discuss her retirement plan investment options.  Mrs. Hall was aware that the agent was a financial advisor with VALIC, a company known for retirement plan expertise.

101.    The agent was duly appointed by VALIC to act on behalf of VALIC as VALIC's agent in the solicitation, recommendation and sale of deferred annuities, and was, upon information and belief, a licensed agent with the State of California Department of Insurance.  The agent recommended to Mrs. Hall that she invest her monies in a VALIC deferred annuity. The annuity was a contributory plan that qualified for favorable income tax treatment pursuant to, upon information and belief, Internal Revenue Code sections 401(a).  As a public school teacher, Mrs. Hall was eligible to participate in salary deferrals for the plan.

102.    At no time during the product recommendation or sale was Mrs. Hall told that the tax-deferral feature of the deferred annuity was redundant and unnecessary for her.  At no time was there any discussion of the relative advantage of life insurance and annuity death benefits and the associated costs.

103.    The agents' recommendation of the deferred annuity was based neither on Mrs. Hall's needs and objectives nor on full and fair disclosure of the redundancy of the

product.  The agent, as VALIC's agent, was paid a sales commission substantially larger than any mutual fund commission available.

104.    Mrs. Hall was not told and was not aware of these facts, and she reasonably relied on the VALIC Agent's recommendation of the product, which was misleading in the absence of a clear disclosure that the main tax-deferred investing advantage of the product was redundant and unnecessary for him.  As a result of the deception in the sale, Mrs. Hall accepted the recommendation to invest in the VALIC deferred variable annuity.  Shortly thereafter, VALIC issued the deferred annuity policy to Mrs. Hall.

105.    Mrs. Hall made additional investments into the contract until the present, including purchases of additional units of interest in the separate account.

106.    In December 2009, Mrs. Hall was shocked to learn for the first time, through discussions with counsel, that the VALIC deferred variable annuity was a redundant and unnecessary product for qualified plan investors such as herself.  Had these facts been meaningfully disclosed during the sales process, Mrs. Hall would not have agreed to purchase the deferred annuity.

## X.    DEFENDANTS' FIDUCIARY DUTIES TO AND SPECIAL RELATIONSHIP WITH PLAINTIFFS AND THE CLASS MEMBERS

107.    In selling deferred annuities, Defendants and their agents pursued, fostered and accepted a relationship with their customers that was based on a high degree of trust and confidence by the customer, and a corresponding duty of defendants and their agents to provide full and fair disclosure and not to mislead, both prior to and at contract inception and throughout the life of the contract.  In violation and breach of this duty, Defendants and their agents embarked upon a fraudulent common course of conduct to sell deferred annuities to the public through false and misleading uniform advertising, sales presentations, and sales materials.

108.    VALIC encouraged consumers to rely on VALIC and its agents (described as "America's Retirement Plan Specialists") through pervasive promotion of the company's purported expertise with retirement plans which was designed to create a

sense of loyalty and trust in the consumer.  Defendants also trained agents on how to establish a relationship of confidence (by asking for personal financial information) and trust in their expertise – specifically for the purpose of making deferred annuity sales to qualified plan investors.  Defendants' objective in creating this atmosphere of trust was to avoid having to explain to consumers why they were being sold a product that would consume a large portion of their retirement assets to purchase insurance to secure a tax-deferral advantage that is inherent in any tax qualified plan.

109.    In addition, Defendants and their agents held and continue to hold a relationship of trust and confidence with Plaintiffs and Class members as a result of the following:

a.    Defendants are an insurer and its affiliates engaged in the business of insurance, which is subject to public interest considerations, and which imposes on Defendants a more stringent standard of conduct than those normally arising out of contract.

b.    Defendants and their agents cultivated a relationship of trust and confidence in Plaintiffs and Class members through Defendants' marketing, sales and servicing of the complex and sophisticated insurance products purchased by Plaintiffs and Class members or their employers.

c.    The contracts purchased by Plaintiffs and Class members were contracts of adhesion that were prepared by Defendants and were not subject to negotiation.  Neither Plaintiffs and Class members nor their employers possess bargaining power equal to that of defendants.

d.    As set forth in detail herein, Defendants and their agents held themselves out as highly skilled financial experts and advisors, possessing superior knowledge, skill and expertise needed to navigate and understand the complex rules that govern qualified plans.  Defendants encouraged Plaintiffs and Class members or their employers to rely on this knowledge and expertise as a basis for trusting and accepting their subsequent recommendations for purchase of the contracts to fund the qualified

plans at issue.  Moreover, Defendants repeatedly promoted in national advertising and sales brochures to their clients that their agents had significant financial expertise and they should be trusted to provide all of the most important information necessary to make an informed decision.

e.       Defendants and their agents, in inducing Plaintiffs and Class members or their employers to purchase the contracts, also held themselves out as confidants of Plaintiffs and Class members or their employers, thereby encouraging the revelation of private and confidential information, including financial statements, tax returns, business plans, and other documents pertinent to financial planning.

f.       Defendants and their agents knew that Plaintiffs and Class members or their employers were ill-equipped to understand the unfamiliar and technical language of the contracts or the complexities of Defendants' products.

g.       Plaintiffs justifiably placed their confidence and trust in Defendants and their agents.  Defendants possessed superior skill, knowledge and expertise in the areas of deferred annuities and retirement plans.  After the sale of the annuities, Defendants continued their efforts to retain the Plaintiffs' confidence and trust.

h.       As a result of the foregoing, a fiduciary duty was created and continues to exist as a result of Defendants' and their agents' undertaking to advise and assist Plaintiffs and Class members regarding their retirement plans.

110.    Based on the foregoing, Defendants owed Plaintiffs and Class members fiduciary duties, including the duty of good faith and fair dealing, the duty of loyalty, the duty to avoid self-dealing, the duty of full and fair disclosure and the duty of care, arising out of the fiduciary relationship between Defendants and their agents and Plaintiffs and Class members.

111.    Defendants and their agents are also subject to duties of fair dealing pursuant to state insurance codes.  Defendants therefore had an affirmative duty to provide complete and truthful information to Plaintiffs and Class members when preparing sales materials and other materials intended to induce purchase of their

deferred annuities for investment in qualified plans, including a duty to comply with existing disclosure laws and a duty to cure any prior misrepresentations or omissions.

112.    In addition to their duties derived from their relationship of trust and confidence, Defendants had an independent duty to disclose information to Plaintiffs and Class members by virtue of their special relationship with them.  Defendants had sole knowledge of, or access to, material facts concerning the inappropriateness of their products for qualified retirement plans, including the fact that the primary economic value of the contracts would not benefit Plaintiffs and Class members.  Defendants were aware that Plaintiffs and Class members did not have access to critically important information and therefore could not evaluate the accuracy of the information provided to them, because of the complex nature of qualified plans and the complicated nature of Defendants' annuity products.  Defendants intentionally kept Plaintiffs and Class members uninformed of these facts, and capitalized on Defendants' sole possession of the material facts, by providing Plaintiffs and Class members or their employers with misleading advertising, sales presentations and sales materials.

## XI.    DEFENDANTS' CONCERTED ACTIVITY AS JOINT CONSPIRATORS

113.    Defendants VALIC and VAMCO have entered into a joint enterprise, evidenced by agreement, common purpose, community of interest, and participation and control in the concerted action, directed against Plaintiffs and Class members.

### COUNT ONE

**(ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER BASED ON THE SALE OF UNITS OF INTEREST IN A SEPARATE ACCOUNT FUNDING VARIABLE ANNUITIES MISREPRESENTATIONS AND OMISSIONS)**

114.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

115.    A unit of interest in a separate account funding a variable deferred annuity is a security subject to the Exchange Act, including Section 10(b) and Rule 10b-5

promulgated thereunder, because the units of interest possess characteristics that are similar to those of investment securities.

116.   As set forth more fully above, Defendants VALIC and VAMCO, in concert with VALIC Agents, by use of the means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a common scheme and continuing course of conduct under which they made material misrepresentations of fact and omitted to state material facts that were necessary to make the statements made, in light of the circumstances in which they were made, not misleading, in connection with the sale of units of interest in a separate account.

117.   The standardized presentations and prospectuses, approved and prepared by VALIC, included the following materially false and misleading representations, among others:

a.   VALIC's deferred annuities provide a tax-deferral benefit for purchasers.  However, Defendants never disclose in the sales process that the purported tax-deferral "benefit" is available to all qualified plan investors, regardless of whether they fund their qualified plan with a deferred annuity or other investments.

b.   Potential purchasers are not told that the tax-deferral feature of their qualified plan investment is provided by the qualified plan, and that the tax-deferral feature of a variable annuity is unnecessary.

118.   These statements and omissions by Defendants and/or VALIC Agents represented an extreme departure from the standards of ordinary care and a danger of misleading buyers.  Defendants were under a duty to make full and fair disclosure of the tax redundancy.

119.   Defendants knew, or were grossly reckless in their failure to know, that their own statements, as well as statements that defendants trained VALIC Agents to make, were materially false and misleading and/or omitted to state material facts that were necessary to make such statements, in light of the circumstances in which they were made, not misleading.

120.    Defendants had the power and duty to control or influence the conduct of the VALIC Agents, had knowledge of, and reasonable ground to believe in, the existence of a course of conduct in which the VALIC Agents made misrepresentations to Plaintiffs and the Class, and were culpable participants in any violations of Section 10(b) of the Exchange Act by the VALIC Agents.

121.    The dissemination of false, misleading and deceptive information by Defendants and VALIC Agents deceived and misled Plaintiffs and the other members of the Class, and caused substantial damage to Plaintiffs and the members of the Class.

122.    In ignorance of the materially false and misleading information and the failure to disclose material facts, and in reliance on the affirmative recommendation of the product and the integrity of the statements made by Defendants and VALIC Agents, Plaintiffs and the members of the Class purchased units of interest in a separate account from Defendants.  Plaintiffs and the other members of the Class did not know, and in the exercise of due diligence could not have known, of the material misrepresentations and omissions set forth in this complaint.  Had Plaintiffs and the other members of the Class known the truth, they would not have invested through VALIC's variable annuity contracts.

123.    As a result of Defendants' actions, Plaintiffs and the Class have been injured and are entitled to, among other things and at their election, damages and/or rescission and restitution.

## COUNT TWO

**(ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED AGAINST ALL CORPORATE DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER BASED ON THE SALE OF UNITS OF INTEREST IN A SEPARATE ACCOUNT FUNDING VARIABLE ANNUITIES – COURSE OF CONDUCT TO MAKE SALES RECOMMENDATIONS WITHOUT ANY BASIS)**

124.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

125.    Each of the Defendants and VALIC Agents employed devices, schemes or artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and the Class in connection with the purchase and sale of securities.

126.    Each of the Defendants and VALIC Agents knowingly and in reckless disregard of the best interests of Plaintiffs and the Class members engaged in a course of conduct to make recommendations for the sale of variable annuities to qualified plan investors without any basis to believe that the purchasers had any insurance needs that would be met by the product.

127.    For the reasons set forth above, each of the Defendants and VALIC Agents recommended securities for Plaintiffs and the Class without regard to whether the purchaser had an insurance need that was met by the product.

128.    Each of the Defendants and VALIC Agents had a duty of fair dealing owed to Plaintiffs and the Class, which included a duty to recommend the purchase of securities based on a determination and basis to believe that the product would meet the needs of the buyer.  Each of these Defendants and VALIC Agents breached these duties by engaging in a course of conduct to recommend the purchase of securities to Plaintiffs and the Class without any basis to believe that an insurance need was met by the product. Plaintiffs and the Class relied upon each of the Defendants and VALIC Agents to recommend only suitable securities for investment.  Each of the Defendants and VALIC Agents knew or was reckless in not knowing that Plaintiffs and the Class so relied, and intended that the Plaintiffs and the Class so rely.

129.    The foregoing activities caused damage to Plaintiffs and the Class, as described in this complaint, in the form of insurance charges and surrender penalties associated with insurance products that Plaintiffs and the Class would not have paid or agreed to pay had they not followed the recommendations.  As a result of Defendants' actions, Plaintiffs and the Class have been injured and are entitled to, among other things and at their election, damages and/or rescission and restitution.

## COUNT THREE

**(ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT BASED ON THE SALE OF UNITS OF INTEREST IN A SEPARATE ACCOUNT FUNDING VARIABLE ANNUITIES)**

130.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

131.   By reason of the Individual Control Person Defendants' control of VALIC, as well as their own culpable participation, the Individual Control Person Defendants are controlling persons within the meaning of Section 20(a) of the Exchange Act, and are jointly and severally liable with, and to the same extent as, VALIC for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as set forth above.

132.   By reason of VALIC's control of the VALIC Agents, as well as its own culpable participation, VALIC is a controlling person within the meaning of Section 20(a) of the Exchange Act, and is jointly and severally liable with, and to the same extent as, the VALIC Agents for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as set forth above.

133.   By reason of VAMCO's control of the VALIC Agents, as well as its own culpable participation, the VAMCO is a controlling person within the meaning of Section 20(a) of the Exchange Act, and is jointly and severally liable with, and to the same extent as, the VALIC Agents for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as set forth above.

134.   By reason of VALIC's control of VAMCO and VALIC Financial Advisors, Inc., as well as its own culpable participation, VALIC is a controlling person within the meaning of Section 20(a) of the Exchange Act, and is jointly and severally liable with, and to the same extent as, VAMCO and VALIC Financial Advisors, Inc., for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as set forth above.

135.   As a result of Defendants' actions, Plaintiffs and the Class have been injured and are entitled to, among other things and at their election, damages and/or rescission and restitution.

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and appoint Plaintiffs as Class Representatives and Hagens Berman Sobol Shapiro as Class Counsel;

B.   Awarding compensatory damages in favor of Plaintiffs and Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment interest thereon and reformation of Plaintiffs' and Class members' contracts with Defendants, if the contract has not already surrendered, or, in the alternative and at the election of the Class, an order declaring that the VALIC contracts are rescinded and awarding restitution of any monies paid to Defendants.

C.   An order providing for declaratory and injunctive relief, including the following:

i.   an order enjoining Defendants VALIC from soliciting sales of, or affirmatively recommending, deferred annuities for use in qualified plans without full and fair disclosure of that the tax-deferred earnings accrual feature is provided by the tax qualified retirement plan and that the tax-deferral accrual feature of the deferred annuity is unnecessary;

ii.   an order enjoining VALIC from soliciting sales of deferred annuities for use in qualified plans using the deceptive course of conduct of recommending the product as appropriate without first identifying an insurance need that is met by the product;

iii.   an order declaring that the fees charged or assessed by VALIC in deferred contracts for insurance, when the contract is used in

qualified plans, do not provide any tax advantages, and are improper in the absence and full and fair disclosure of the tax redundancy;

    iv.    an order enjoining VALIC from charging surrender fees with respect to any qualified deferred annuity;

    vii.    other equitable relief that the Court may deem proper.

D.    An order requiring disgorgement of, imposing a constructive trust upon, or impounding the ill-gotten monies and profits of Defendants VALIC, or freezing Defendants' assets; and/or requiring Defendants to pay restitution to Plaintiffs and all Class members, including return of annuity fees, surrender fees, and state insurance premium taxes, and restitution of the investment earnings that Plaintiff and Class members would have received on those amounts if they had not been improperly induced to invest in deferred annuities; and/or restoring all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent, or unfair business act or practice;

E.    An award of punitive damages against VALIC for its outrageous, intentional, evil-minded, malicious and wanton misconduct.

F.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury for all legal claims alleged herein.

1    RESPECTFULLY SUBMITTED this 21st day of December, 2009.

2                                  HAGENS BERMAN SOBOL SHAPIRO LLP

3

4

5                          By  S/Robert B. Carey
                                Robert B. Carey
6                               Leonard W. Aragon
                                11 West Jefferson Street, Suite 1000
7                               Phoenix, Arizona 85003

8                               Austin Tighe
9                               FEAZELL & TIGHE LLP
                                6618 Sitio Del Rio Boulevard
10                              Building C-101
                                Austin, Texas 78730
11

12                              J. Grant Woods
13                              GRANT WOODS, P.C.
                                1726 North Seventh Street
14                              Phoenix, Arizona 85006

15                              Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28